## UNITED STATES DISTRICT COURT

## DISTRICT OF DELAWARE

| | |
|---|---|
| JIM FITZGERALD, derivatively on behalf of COOPER TIRE & RUBBER COMPANY,<br><br>                                    Plaintiff,<br><br>v.<br><br>ROY ARMES, BRADLEY HUGHES, R.W. HUBER, THOMAS P. CAPO, STEVEN M. CHAPMAN, JOHN J. HOLLAND, JOHN F. MEIER, CYNTHIA A. NIEKAMP, JOHN H. SHUEY, RICHARD L. WAMBOLD and ROBERT D. WELDING,<br><br>                                    Defendants,<br><br>and<br><br>COOPER TIRE & RUBBER COMPANY,<br><br>                      Nominal Defendant. | Civil Action No.<br><br><br><br><br><br><br><br><br><br><br><br><br><br>__JURY TRIAL DEMANDED__ |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1.    Plaintiff Jim Fitzgerald ("Plaintiff"), by and through his undersigned attorneys, hereby submits this Verified Shareholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant  Cooper Tire & Rubber Company ("Cooper" or the "Company") against certain members of its Board of Directors (the "Board") and executive officers, seeking to remedy defendants' breaches of fiduciary duties and unjust enrichment from June 2013 to the present (the "Relevant Period").

## NATURE OF THE ACTION

2.    According to its public filings, Cooper, together with its subsidiaries, manufactures and markets replacement tires worldwide.  It operates in two segments: North

American Tire Operations and International Tire Operations.    The North American Tire Operations segment offers passenger car and light truck tires, as well as distributes tires for racing, medium trucks, and motorcycles to independent tire dealers, wholesale distributors, regional and national retail tire chains, and other automotive product retail chains.    The International Tire Operations segment manufactures and markets passenger car, light truck, motorcycle, and racing tires and tire retread material.

3.    This action arises out of the failed acquisition of Cooper, in a deal that was described by one of the Company's former executives as an example of classic "corporate greed."  As set forth herein, defendants--enticed by an enormous payout that would make them all multimillionaires--went to great lengths to push through a sale of the Company to Indian-based tire company Apollo Tyres Ltd. ("Apollo").  In the hopes of closing that transaction and enriching themselves, defendants concealed the extraordinary risks that ultimately doomed the transaction and which have caused permanent damage to Cooper's business.

4.    Specifically, on June 12, 2013, defendants caused Cooper to announce that it had entered into an agreement to be acquired by Apollo for $35 per share, putting the total deal at a value of $2.5 billion in cash.  The merger would create the seventh largest tire manufacturer in the world by revenue, and defendants touted the deal to the Company's shareholders as an unbeatable offer.  Indeed, the $35 per share price defendants told investors they would receive upon the consummation of the acquisition represented a 40% premium to Cooper's 30-day volume-weighted average price.

5.    Although defendants presented the deal to investors as a "compelling" transaction that was "in the best interests of shareholders," defendants concealed known, material risks that made it highly unlikely, if not impossible, that the deal would close at $35 per share.  Indeed,

defendants concealed that the joint venture partner in the Company's most important subsidiary—Cooper Chengshan Tire Company, Ltd. ("CCT")—vigorously opposed the transaction, had the ability to thwart the deal, and demanded extraordinary compensation in return for any agreement that it would not do so.  The fact that Cooper's joint venture partner, Chengshan Group ("Chengshan"), opposed the Apollo merger was obvious to defendants, as Chengshan itself had sought to acquire Cooper prior to the announcement of the deal—a crucial fact that Cooper concealed from investors and Apollo throughout the Relevant Period.

6.      As noted by Apollo in its recent claims against Cooper in Delaware Chancery Court, in the action captioned *Cooper Tire & Rubber Co. (CTB) v. Apollo (Mauritius) Holdings Pvt*, CA8980, Delaware Chancery Court (Wilmington) (the "Chancery Action"):

> Cooper is not in compliance with the Merger Agreement, in part because its representations and warranties are not true and because it has failed to perform its covenants. This state of affairs can be traced to two sets of events. First, Cooper does not have control over its most significant subsidiary, a majority-owned and consolidated joint venture in China called Cooper Chengshan (Shandong) Tire Company, Ltd. ("CCT"). Indeed, following the announcement of the Merger Agreement, it has become clear and Cooper has admitted that Cooper has lost any physical control over, or even access to, CCT's operations, facilities, assets, and accounting books and records, assuming it ever possessed the access or control that it warranted it had in the Merger Agreement.

7.      In fact, prior to the announcement of the Apollo merger, Cooper senior executives, including defendant Armes (defined further herein), held numerous meetings with Chengshan representatives concerning a proposed acquisition of Cooper.  Moreover, internal documents show that defendants had anticipated a higher bid from Chengshan than what had been proposed by Apollo.[1]  But instead of engaging in further negotiations with Chengshan to

---

[1] There is currently a related securities class action against Cooper and certain of the defendants named herein pending in the U.S. District Court for the District of Delaware, captioned *Ofi Risk Arbitrages, et al. v. Cooper Tire & Rubber Co., et al.*, No. 1:14-cv-00068-LPS (D. Del.) (the "Securities Action").   On January 17, 2014, the plaintiffs to the Securities Action filed a Complaint for Violations of Federal Securities Laws (the "Securities Complaint").   While Plaintiffs and their undersigned attorneys have conducted their own independent investigation of

seek a better deal for Cooper's shareholders—or even disclose to Apollo or Cooper shareholders the fact that Cooper's joint venture partner had sought to acquire the Company for itself— defendants spurned Chengshan, and promptly moved to lock in an agreement with Apollo.

8.       Despite the fact that Chengshan's opposition to the Apollo merger posed a massive risk to the transaction, defendants touted CCT and the Company's Chinese operations as the central factor in favor of the deal, and featured them prominently in its announcement.  For example, on June 12, 2013, in a press release announcing the acquisition, defendants described the merger as bringing "together two companies with highly complementary brands, geographic presence, and technological expertise to create a global leader in tire manufacturing and distribution" with "strong presence in high-growth end-markets," including China.  That press release highlighted Cooper's "Chengshan" brand, and noted that "Cooper is one of the most respected names in the tire industry, with an extensive distribution network and manufacturing infrastructure, and a particularly robust presence in North America and China."  According to the press release, due to Cooper's significant presence in China, the "combined company will be uniquely positioned to address large, established markets, such as the United States and the European Union, as well as fast-growing markets of India [and] China…where there is significant potential for further growth."  Accordingly, the announcement of the deal not only failed to identify Chengshan's opposition to the transaction as a major risk that was likely to prevent Apollo's acquisition of Cooper, but falsely touted the Chengshan partnership as an asset that made the transaction more likely to close.

9.       Defendants caused the Company to file numerous documents with the United States Securities and Exchange Commission ("SEC") on June 12, 2013, which provided

the wrongdoing alleged herein, many of the allegations herein are based upon allegations contained in the Securities Action.

additional details to investors concerning the merger.  The SEC filings continued to highlight Cooper's China operations and its Chengshan brand.  For example, defendants claimed that the combined company would have "a strong presence in the largest tire market of North America as well as the fastest-growing geographies such as China and India, among others."

10.     Defendants also represented in the Company's SEC filings that Cooper had exclusive possession and control over all of its business operations, including CCT; had effective internal controls over its financial reporting; and had policies and procedures in place to ensure its subsidiaries' compliance with all regulatory and other legal requirements—representations that were false and concealed the true risks of the transaction.  Specifically, the defendants caused the Company to file the Agreement and Plan of Merger, dated June 12, 2013, for the Cooper and Apollo transaction (the "Merger Agreement") as an exhibit to a Form 8-K.  In that document, defendants represented, among other things, that:

• "[T]he Company or one of its Subsidiaries has exclusive possession of each Owned Real Property and Leased Real Property," including the CCT facilities;

• that Cooper "maintained effective internal controls over its financial reporting, that it had maintained accurate and reasonably detailed records concerning the transactions and disposition of its assets, recorded transactions as necessary in order to permit preparation of financial statements in accordance with GAAP, and provided reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on its financial statements;"

• That Cooper and its "Subsidiaries were in compliance with applicable Laws, and have policies and procedures providing reasonable assurance of continued compliance with such Laws;" and that

• "Since December 31, 2012…its Subsidiaries and, to the Knowledge of the Company, its Joint Ventures have conducted their respective businesses only in the ordinary course of business consistent with past practice in all material respects."

11.     Defendants continued to promote the transaction and the justification for the $35 per share price by touting Cooper's projected financial results and presenting Cooper's business as stable and growing.  For example, in the proxy statement filed with the SEC and disseminated

to investors on August 30, 2013 seeking shareholder approval of the deal (the "Proxy"), defendants provided financial projections showing that Cooper expected net sales of $4.2 billion and earnings of $528 million for 2013.

12.     In response to defendants' statements touting the $2.5 billion merger and the $35 per share that investors would receive once that merger closed, the Company's representations concerning its Chinese operations and CCT subsidiary, and the numerous assurances concerning the Company's control over its subsidiaries, their business operations, and the Company's internal controls over financial reporting, the price of Cooper shares rose from a closing price of $24.56 per share on June 11, 2013 to close at $34.66 per share on June 12, 2013.

13.     These representations were false and misleading with respect to the true risks of the transaction.  In reality, under defendants' direction and on their watch, the merger was fraught with risk, and it was highly unlikely to be consummated on the terms disclosed in defendants' proxy materials because, as defendants knew, Chengshan vigorously opposed the transaction.  Defendants also knew that CCT was one of primary factors motivating Apollo to agree to the deal, as Cooper had specifically touted CCT as providing Apollo with a window to the Chinese market.  But under defendants' direction and on their watch, Cooper had no effective control over CCT, and Chengshan (which has a massive presence in China where CCT operates) had the unilateral ability to direct operations at the CCT facility and could, at whim, shut down one of the most significant components of Cooper's business.  Indeed, Chengshan had previously denied Cooper executives access to the CCT facility.  Defendants also knew that Cooper did not even have access to CCT financial information, except as permitted by Chengshan.

14.     Defendants failed to disclose these crucial facts to Apollo (and Cooper investors) even though Apollo was intently focused on Chengshan's reaction to the transaction during the

premerger due diligence process.  In fact, in response to Apollo's requests for more information, defendant Armes told Apollo that Chengshan's chairman, Che Hongzhi, who goes by "Chairman Che," could respond in one of three ways: "One, he could go along with the acquisition and really support it and transition it.  Second, he could possibly offer up his shares.  He has a 35% in the joint venture.  He could possibly be looking for selling those.  And then, thirdly, he could – he could disrupt it or try to undermine it."  Accordingly, in order to prevent a negative reaction, Apollo requested to meet personally with Chairman Che.  At that May 15, 2013 meeting, which was attended by Apollo and Cooper representatives, Chairman Che explained that he was opposed to any transaction with Apollo and, at the very least, demanded compensation in return for any approval of the deal, saying "My father is changing to my stepfather – what am I getting?"  Defendants understood that this meant Chairman Che demanded compensation for his approval, and that the failure to provide for such compensation as part of the transaction would present tremendous risks to closing on the deal.  Indeed, on June 11, 2013, the day before the merger was announced to Cooper's shareholders, defendant Armes met again with Chairman Che, who reiterated that "he would really not like to [sic] us sell the company and his interest was in keeping Cooper and keep things going the way that we were."

15.    Unlike Apollo, the public was not aware of Che's extortionate demand, as defendants purposely failed to disclose this fact.  Defendants even denied Apollo the full story.  While Apollo was aware of Che's diffident reaction, it was denied information crucial to understanding the magnitude of the risk – the fact that Che had previously expressed an interest in buying Cooper himself.  Thus, Apollo (and the public) could not rationally evaluate the likelihood that Che would do his utmost to obstruct an acquisition by Apollo absent a massive payment.

16.     After the Merger Agreement was signed, a number of challenges to the deal materialized.  First, two grievances were filed by the United Steelworkers, Local Union 725L and 207L ("USW"), challenging the merger on the grounds that it violated Cooper's Memoranda of Agreement for its plants in Texarkana, Arkansas and Findlay, Ohio.

17.     The grievances were filed on August 1, 2013, and arbitration was held in Washington D.C. at the end of the month.  On September 13, 2013 the arbitrator issued its decision, ruling against Cooper and finding that the "Company is ordered to refrain from selling or transferring the Texarkana and Findlay plants pursuant to the Agreement and Plan of Merger unless and until the Union has entered into agreements with the buyer, Apollo Tyres B.V., prior to the closing recognizing the Union as the bargaining agent."

18.     Second, following the announcement of the transaction, workers at the CCT facility went on strike demanding termination of the merger.  CCT employees stopped producing Cooper tires, and denied Cooper all access to the facility and to any information concerning CCT.  While CCT employees temporarily returned to work on June 28, 2013, the strike resumed on July 13, 2013, and CCT workers began barring Cooper-affiliated managers from the CCT facility.  For example, on July 17 and 18, employees at the CCT facility prevented Cooper representatives from removing Cooper's own tire molds from the facility.  CCT employees have since refused to produce any Cooper-branded tires, and have physically barred Cooper-appointed managers from accessing the CCT facility, obtaining CCT's financial books and records, and have even prevented CCT from entering certain operating and financial data into CCT's computer systems that Cooper can access remotely.  Defendants themselves have admitted that the Company had no physical control over, or even access to, CCT's operations, facilities, assets, and accounting books and records, and did not have any such control or access for months.

19.     Despite evidence to the contrary, defendants continued to conceal the true impact the CCT strike had on the viability of the deal.  For example, in the Proxy, defendants stated, "[n]either the strike nor the plant slowdown are expected to have an effect on the consummation of the merger."

20.     Apollo was stunned by the CCT shut-down, and immediately engaged Cooper to determine its impact on the transaction.   However, defendants' inability to obtain basic information from CCT and generate financial results for its most important subsidiary was a fundamental roadblock preventing Cooper from closing on the deal.  Defendants' lack of control over CCT contradicted their representations to Apollo and, under the terms of the Merger Agreement, enabled Apollo to simply walk away from the deal.  Recognizing that they were unable to complete the transaction at the $35 per share price that they touted to investors, defendants caused Cooper to file a lawsuit on October 4, 2013, preemptively seeking to force Apollo to close on the merger.  On, October 7, 2013, before the market opened, defendants caused the Company to filed a Form 8-K with the SEC which included a press release revealing that the deal was unraveling, as well as a copy of the complaint Cooper filed against Apollo on October 4, 2013.

21.     In response to these disclosures, and the realization that the merger was in dire jeopardy and would not be consummated at the $35 per share price that defendants announced on June 12, 2013 (and which shareholders, without complete and accurate information, had approved just days before), Cooper's common shares plunged. Specifically, Cooper stock fell from $31.27 per share on October 3, 2013 to close at $25.72 per share on October 7, 2013.

22.     On October 14, 2013, Apollo filed its Answer to Cooper's Complaint in the Delaware Chancery Court.  Apollo counterclaimed, stating that under the Merger Agreement

"Cooper promised to do a number of things that it had not done."  Apollo further noted that Cooper was not in compliance with the Merger Agreement, "in part because its representations and warranties are not true and because it has failed to perform its covenants . . . . [] Cooper does not have control over its most significant subsidiary, [CCT].   Indeed, following the announcement of the Merger Agreement, it has become clear and Cooper has admitted that Cooper has lost any physical control over, or even access to, CCT's operations, facilities, assets, and accounting books and records, assuming it ever possessed the access or control that it warranted it had in the Merger Agreement.

23.     Additionally, Apollo noted that Cooper, as a result of its arbitration with USW, had been enjoined from consummating transactions contemplated by the Merger Agreement until a labor agreement had been reached with USW.

24.     Significant testimony and evidence from the November trial in the Delaware Chancery Court confirms that Cooper executives knew all along that Chengshan posed a material risk to the transaction, which was never disclosed to investors.  Specifically, Cooper executives, including defendant CEO Roy Armes (defined further herein), repeatedly testified that, prior to the beginning of the Relevant Period and the announcement of the merger, Cooper was informed that Chengshan vehemently opposed the merger and required that it be compensated in any Apollo transaction.  Indeed, according to that testimony, formal negotiations beginning in March 2013 revealed that the Chengshan objected to the deal, and that CCT had in fact demanded $400 million for its stake in the venture—or nearly one-sixth of the cost of the entire deal.

25.     Moreover, evidence produced in that litigation confirms that numerous other statements in the Proxy were materially false and misleading.  For example, while defendants reported projected net sales of $4.2 billion for 2013 in the Proxy, defendants produced internal

reports weeks earlier that showed 2013 revenues were projected to be $3.9 billion—a $300 million difference—and that sales had continued to drop in the weeks leading up to and through the August 30, 2013 proxy filing and September 30, 2013 vote.  Indeed, even though defendants had shared Cooper's increasingly dire financial projections with Apollo—further distressing its potential suitor by reporting that 2013 projected profits had been nearly cut in half over the course of just two months—all others were kept in the dark.

26.     On November 8, 2013, the Delaware Chancery Court denied Cooper's request for an order requiring Apollo to close on the merger, holding that Apollo had not breached the agreement.  In so ruling, the Delaware Chancery Court made clear that, based on the information disclosed for the first time at trial, it was highly doubtful Cooper could ever have been able to satisfy its obligations under the Merger Agreement because Cooper was unable to produce its third-quarter financial results:

> [T]he reason for the extreme expedition of this action . . . is that Cooper seeks an order compelling specific performance by the morning of the business day next following closing arguments: November 12, 2013. Specific performance by such a date, according to Cooper, would relieve it of the obligation to disclose thirdquarter financials to Apollo and its lenders, as would otherwise be required by financing agreements in support of the merger no later than November 14, 2013. Cooper is unlikely to be able to provide those financials due to the physical seizure of a Cooper subsidiary in China by a minority partner in that venture. In response to disclosures revealing that Cooper was not entitled to force Apollo to close, Cooper stock fell again, from $26.90 per share on November 7, 2013 to close at $23.82 per share on November 8, 2013, wiping out another $175 million in shareholder wealth.

27.     In response to these disclosures, Cooper stock plummeted, falling from $26.90 per share on November 7, 2013 to $23.82 per share on November 8, 2013.  The stock has not recovered to any appreciable extent.

28.     Then, on November 12, 2013, defendants caused the Company to file with the SEC a Notification of Late Filing, disclosing that it would be unable to timely file its Form 10-Q for the quarter ended September 30, 2013 because it had no access to any business and financial

information relating to CCT.   Further, defendants caused the   Company to disclose that it expected a "significant change" in its results of  operations and that its operating profit will be "significantly lower" than Cooper reported for the same period a year before, partly as a result of the effects from the strike at CCT.   According to defendants, given that the Company does not have sufficient information regarding its most important and profitable subsidiary, "a reasonable estimate of the results cannot be made."

29.     Following these disclosures, additional developments in the Delaware Chancery Court litigation confirmed that Cooper's claims against Apollo were without merit, and that the merger and the shut-down at the CCT subsidiary had in fact put Cooper's long-term business prospects in jeopardy.  Specifically, on December 16, 2013, the Delaware Supreme Court denied Cooper's appeal of the Delaware Chancery Court's November 8, 2013 ruling, holding that the appeal had been "improvidently accepted."  Then, on December 30, 2013, defendants caused the Company to announce that it was formally terminating the merger.  On a webcast with investors that day, defendant Armes acknowledged that "the financing for the transaction [was] no longer available" and that it was "a reality that the agreement both companies signed on June 12 will not be consummated by Apollo."  On that same conference call, defendant Hughes (defined further herein) admitted that Cooper still did not have any control over its CCT subsidiary or access to the information needed to generate the Company's financial results, and could not provide any estimate of "when the situation will be resolved or when we will resume normal [financial] reporting."

30.     Following Cooper's cancellation of the merger, in a December 30, 2013 press release, Apollo stated "Cooper's actions leave Apollo no choice but to pursue legal remedies for Cooper's detrimental conduct."

31. Throughout the Relevant Period, defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operation, and prospects. Specifically, defendants made false and/or misleading statements and/or failed to disclose that: (i) the Merger was an incredibly high-risk transaction that had no reasonable prospects of being consummated at the $35 per share price announced on June 12, 2013; (ii) Cooper did not have exclusive possession over its primary subsidiary, CCT, and in fact never had such possession or control; (iii) Cooper's lack of control over CCT, which accounted for nearly a quarter of its business, rendered Cooper's financial results unreliable; (iv) Cooper's operating results had grown increasingly dire in the weeks leading up to and through the August 30, 2013 proxy filing and the September 30, 2013 shareholder vote, and the projections Cooper disclosed to investors provided a materially false and misleading picture of Cooper's financial performance and the true risk of the transaction; (v) Cooper lacked effective internal controls over its financial reporting; and (vi) rather than serve as a value-enhancing transaction, the Merger posed serious, long-term risks and harm to Cooper's business.

32. Accordingly, as a result of defendants' breaches, the Company has been damaged.

## JURISDICTION AND VENUE

33. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) in that Plaintiff and defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs. Moreover, this Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

34.    Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this district.   One or more of the defendants either resides in or maintains executive offices in this district, and defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.   In addition, Cooper is incorporated in this District.

## THE PARTIES

35.    Plaintiff is a current shareholder of Cooper and has continuously held Cooper stock since May 1984.   Plaintiff is a citizen of Mississippi.

36.    Nominal defendant Cooper is a Delaware corporation, with its principal executive offices at 701 Lima Avenue, Findlay, Ohio 45840.   According to its public filings, Cooper, together with its subsidiaries, manufactures and markets replacement tires worldwide.   It operates in two segments, North American Tire Operations and International Tire Operations. The North American Tire Operations segment offers passenger car and light truck tires, as well as distributes tires for racing, medium trucks, and motorcycles to independent tire dealers, wholesale distributors, regional and national retail tire chains, and other automotive product retail chains.   This segment sells its products through three own retail stores.   The International Tire Operations segment manufactures and markets passenger car, light truck, motorcycle, and racing tires and tire retread material.

37.    Defendant Roy Armes ("Armes") has served as the Company's President and Chief Executive Officer ("CEO") since January 2007 and as Chairman of the Board since December 2007.   Upon information and belief, defendant Armes is a citizen of Ohio.

38.    Defendant Bradley Hughes ("Hughes") has served as the Company's Vice

President and Chief Financial Officer ("CFO") since November 2009.  Upon information and belief, defendant Hughes is a citizen of Ohio.

39.     Defendant R. W. Huber ("Huber") has served as the Company's Director of External Reporting since August 2005.  Prior to that, defendant Hubert served in a number of positions in the Company since 1984.  Upon information and belief, defendant Huber is a citizen of Ohio.

40.     Defendant Thomas P. Capo ("Capo") has served as a director of the Company since 2007.  In addition, defendant Capo served as a member of the Board's Audit Committee (the "Audit Committee") during the Relevant Period.  Upon information and belief, defendant Capo is a citizen of Michigan.

41.     Defendant Steven M. Chapman ("Chapman") has served as a director of the Company since 2006.  In addition, defendant Chapman served as a member of the Audit Committee during the Relevant Period.  Upon information and belief, defendant Chapman is a citizen of Indiana.

42.     Defendant John J. Holland ("Holland") has served as a director of the Company since 2003.  Upon information and belief, defendant Holland is a citizen of California.

43.     Defendant John F. Meier ("Meier") has served as a director of the Company since 1997.  Upon information and belief, defendant Meier is a citizen of Ohio.

44.     Defendant Cynthia A. Niekamp ("Niekamp") has served as a director of the Company since 2011.  In addition, defendant Niekamp served as a member of the Audit Committee during the Relevant Period.  Upon information and belief, defendant Niekamp is a citizen of Michigan.

45.     Defendant John H. Shuey ("Shuey") has served as a director of the Company

since 1996.  In addition, defendant Shuey served as the Chairman of the Audit Committee during the Relevant Period.  Upon information and belief, defendant Shuey is a citizen of Florida.

46.     Defendant Richard L. Wambold ("Wambold") has served as a director of the Company since 2003.  Upon information and belief, defendant Wambold is a citizen of Texas.

47.     Defendant Robert D. Welding ("Welding") has served as a director of the Company since 2007.  Upon information and belief, defendant Welding is a citizen of Colorado.

48.     Collectively, defendants Armes, Hughes, Huber, Capo, Chapman, Holland, Meier, Niekamp, Shuey, Wambold, and  Welding shall be referred to herein as "Defendants."

49.     Collectively, defendants Capo, Chapman, Niekamp, and Shuey shall be referred to as the "Audit Committee Defendants."

### DEFENDANTS' DUTIES

50.     By reason of their positions as officers, directors, and/or fiduciaries of Cooper and because of their ability to control the business and corporate affairs of Cooper, Defendants owed Cooper and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Cooper in a fair, just, honest, and equitable manner.  Defendants were and are required to act in furtherance of the best interests of Cooper and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to Cooper and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

51.     Defendants, because of their positions of control and authority as directors and/or officers of Cooper, were able to and did, directly and/or indirectly, exercise control over the

wrongful acts complained of herein.   Because of their advisory, executive, managerial, and directorial positions with Cooper, each of the Defendants had knowledge of material non-public information regarding the Company.

52.     To discharge their duties, the officers and directors of Cooper were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.   By virtue of such duties, the officers and directors of Cooper were required to, among other things:

    a.   Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

    b.   Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

    c.   When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

53.     Pursuant to the Audit Committee's Charter, the members of the Audit Committee are required, *inter alia*, to:

    a.   Review and discuss with appropriate officers of the Company and the independent auditors the annual audited and quarterly financial statements of the Company…. The Committee will make a recommendation to the Board whether or not the financial statements be included in the Company's Form 10-K;

    b.   Review and discuss earnings and other financial press releases (including any use of "pro forma" or "adjusted" non-GAAP information);

    c.   Discuss with management and the internal auditors management's process for assessing the effectiveness of internal control over financial reporting under Section 404 of the Sarbanes-Oxley Act ("SOX Certifications"), including any material weaknesses or significant deficiencies identified;

d. Discuss guidelines and policies with respect to risk assessment and risk management to assess and manage the Company's exposure to risk. The Committee should discuss the Company's major financial risk exposures and the steps management has taken to monitor and control these exposures;

e. Review and discuss with the independent auditors, the senior internal auditing executive, the General Counsel and, if and to the extent deemed appropriate by the Chairman of the Committee, members of their respective staffs the adequacy of the Company's internal accounting controls, the Company's financial, auditing and accounting organizations and personnel;

f. Discuss with management its process for performing its required quarterly SOX Certifications, including the evaluation of the effectiveness of disclosure controls by the CEO and CFO; and

g. Advise the Board with respect to the Company's policies and procedures regarding compliance with applicable laws and regulations and with the Company's Code of Business Conduct and Ethics.

## SUBSTANTIVE ALLEGATIONS

### A.  <u>Company Background</u>

54.  Cooper, founded in 1914, is the fourth largest tire manufacturer in North America, and the eleventh-largest tire manufacturer in the world by revenue.  Based in Findlay, Ohio, Cooper and its family of companies currently operate 9 manufacturing facilities and 38 distribution centers in 11 countries.  As of December 31, 2012, Cooper employed 13,550 people worldwide.  The Company is organized into two reportable business segments: North American Tire Operations, which manufactures and markets passenger car and light truck tires for sale in the U.S., and International Tire Operations, which includes the Company's manufacturing operations in the United Kingdom, the Republic of Serbia and the People's Republic of China.

55.  Cooper has two significant manufacturing facilities in China.  The Company's Cooper Kunshan entity, located in Kunshan, China, manufactures light vehicle tires largely for sale in markets outside China.  Under Cooper's agreement with the government of China, beginning in 2013, tires produced at this facility were permitted to be sold in the domestic

Chinese market.

56.     CCT, located in Rongcheng, in eastern Shandong province, is Cooper's other Chinese business, its most important subsidiary, and operates Cooper's most profitable manufacturing facility.   CCT employs 5,000 workers, or nearly 40% of Cooper's entire workforce, and is responsible for approximately one-quarter of all of Cooper's revenues and profits.  CCT is 65% owned by Cooper, and 35% owned by Chengshan.  A chart demonstrating Cooper's ownership structure of CCT is set forth below:



57.     Cooper's Chinese operations were one of the primary reasons that Apollo was interested in acquiring Cooper.   According to Apollo managing director Neeraj Kanwar's testimony, "China was very, very important for the transaction and still is very important for the transaction.  It is the fastest growing economy of the world."

58.     Beginning in January 2013, Apollo and Cooper began "serious" discussions about

a potential merger, and began identifying the major negotiating points in the transaction.   As early as March 7, 2013, Cooper and Apollo identified potential risks to the deal as including the contracts with Cooper's domestic unions as well as the attitude of Chengshan.

59.     It has been alleged that defendant Armes, Cooper's Chairman and CEO, testified that on March 7, 2013, Apollo expressed concern about how Chengshan Group head Chairman Che would react to this acquisition.   Defendant Armes informed Apollo that one possibility with regards to the venture was that Chairman Che "could disrupt it or try to undermine it."

60.     Indeed, Chenghsan's opposition to any potential transaction was conveyed to Cooper at a May 15, 2013 meeting with Chengshan, which was attended by Apollo managing director Neeraj Kanwar and Cooper representatives.   According to Kanwar's testimony, during that meeting, Chairman Che explained that he was opposed to any transaction with Apollo and, at the very least, demanded compensation in return for any approval of the deal, saying "My father is changing to my stepfather – what am I getting?"

61.     Despite this warning, Defendants concealed Chengshan's opposition to Apollo, and maintained that CCT was not an obstacle to completing the merger.   In fact, Defendants did not disclose Chengshan's threat to the deal and, rather than disclose this significant risk, Defendants touted CCT as a valuable asset that would motivate Apollo to close the deal.   In fact, Cooper also concealed this very risk from Apollo.   For example, as was only revealed in the November 2013 trial, during Cooper and Apollo's negotiations, Cooper represented to Apollo that its Chinese platform, including CCT, was a "very low risk way to launch Apollo as a player in the China market," and that the Chengshan "was a very good partner."   According to Cooper, Chengshan had no veto or put rights, and told Apollo that the Chengshan's approval for the merger would not be required.

62.     As was revealed in trial testimony, Cooper executives knew the opposite was true—that Chengshan vigorously opposed the deal—because Chengshan had itself sought to acquire Cooper.   Internal Cooper documents produced at trial showed that, prior to the announcement of the merger, Cooper had been in negotiations with Chengshan concerning a proposed acquisition and that Cooper had in fact anticipated a higher bid from Chengshan than what had been proposed by Apollo.  As defendant Armes testified, he knew that Chengshan was preparing a proposal to acquire Cooper but that Chengshan was apparently not able to arrange financing before the Apollo acquisition was announced.

63.     Rather than giving Chengshan time to arrange financing for a competing bid and seek to maximize the value for Cooper's shareholders, Defendants moved quickly to lock in the offer from Apollo, despite the obvious risk posed by Chengshan.  Accordingly, Defendants knew that the joint venture partner vigorously opposed the deal with Apollo because Cooper had spurned Chengshan's attempts to acquire Cooper, and, at minimum, Chengshan required compensation in return for any approval of the transaction.  At trial, defendant Armes revealed that on June 11, 2013, prior to Apollo's signing of the Merger Agreement and the day before the deal was announced to shareholders, Chairmen Che reiterated to Defendant Armes "that he would really not like to [sic] us to sell the company and his interest was keeping Cooper and keep things going the way that we were."

64.     Defendants' knowledge of the true risks of the transaction is also demonstrated by the fact that Defendants sought to include a Material Adverse Event clause in the Merger Agreement that they purportedly believed would allow them to argue that a negative reaction by Chengshan would not constitute an event that would permit Apollo to walk away from the deal. However, as revealed at the trial at the end of the Relevant Period, throughout the extensive

negotiations regarding this very term, Defendants never disclosed to Apollo that Cooper was specifically contemplating the risk of an adverse reaction by Chengshan.  In fact, rather than negotiate in good faith, Defendants falsely told Apollo that Chengshan and Chairman Che were not a threat because Cooper had control over CCT, appointed the key operational personnel at the subsidiary, and that "Cooper was the industrial partner running this operation, and that Chairman Che was kind of the local partner who was…there" and only "necessary for local reasons."

**B.**     **CCT Workers' Strike**

65.     Almost immediately after the merger was announced, CCT workers went on strike and, by June 21, 2013, CCT operations were completely shut down.  By July 12, 2013, the Company had lost all access to the CCT facility.  Indeed, under Defendants' direction and on their watch, Cooper was unable to remove its own tire molds from the CCT facility because security forces prevented Cooper representatives from entering the facility.  While the CCT plant resumed production on August 17, 2013, Chengshan ordered that the CCT plant stop producing Cooper-branded tires.  Further, CCT workers physically blocked Cooper-appointed managers from accessing the plant, and denied Cooper the ability to obtain CCT's business and financial records, going so far as to prevent CCT workers from inputting financial data into computer systems to which Cooper has remote access.  As a result, under Defendants' direction and on their watch, Cooper has been unable to produce financial results for nearly a quarter of its business.

66.     As defendant Armes admitted, Defendants knew that Chairman Che controlled the shut-down, and that the strike was not the result of any employee-initiated action.  Indeed, Defendants were specifically advised that the protest at CCT was orchestrated by Chairman Che

and organized by Chengshan Group shareholder Liu Shengli, and that middle management warned workers at the CCT facility that "anyone that does not take part in the protest will be fired."

67.     On July 10, 2013, Cooper executives (including, upon information and belief, certain of the Defendants) met with Chairman Che to try and resolve the CCT strikes.  According to defendant Armes' notes of the meeting, "[i]t was clear that Che only wanted to hear that we were stopping the acquisition by Apollo."

### C.     The Company's Financial Condition Declines Rapidly

68.     In addition to physically barring Cooper individuals from accessing the CCT facility and obtaining basic information concerning its most important subsidiary, Chengshan has also filed formal legal action in China to dissolve the joint venture.  In that lawsuit, Chengshan claimed that the merger has caused the CCT labor union to implement a work stoppage because the merger agreement does not adequately provide for CCT's employees, and has asked the court to dissolve the partnership.

69.     While Chengshan had overtaken the CCT facility and initiated litigation, the Company's business outside China was suffering as well, and its sales had begun to decline at an alarming rate.  For example, on July 21, 2013, Defendants provided Apollo an initial forecast that included projections of $4.3 billion in revenues and $380 million in operating profit for 2013.  Just weeks later, however, on August 9, 2013, Defendants provided Apollo with a revised 2013 forecast, showing $3.9 billion in revenues and $363 million in operating profit.  By September 9, 2013, Defendants caused Cooper to revise its business plan again, showing further substantial reductions: $3.6 billion in revenues and $315 million in operating profit for 2013.  According to correspondence that was produced in connection with the Delaware litigation,

Defendants repeatedly told Apollo that the declining financial results were attributable largely to deferred pricing actions in the second quarter that impacted sales volumes and would, in fact, be compensated by over-performance later in the third quarter.

70.    However, on September 17, 2013, with two weeks left to go in the third quarter, Defendants caused the Company to provide new forecasts that had been revised downward yet again, projecting $3.4 billion in revenues and $257 million in operating profit for 2013.  In other words, under Defendants' direction and on their watch, Cooper had suffered a staggering shortfall from the revenues and operating profit Cooper projected in July, which were 25% and 48% higher than the figures provided just two months later.  Moreover, as of the beginning of October 2013, Defendants' projections reflected a 25% decline in projected operating profit for September alone, showing that Defendants' assurances of "catch-up" performance in the third quarter were wrong, and the Company's actual profitability was close to half of what Defendants projected just weeks earlier.

71.    Defendants kept the Company's declining financial position, and its impact on the Company's merger prospects, a secret.  Indeed, Defendants caused the Company to publicly misrepresent its financial projections in the Proxy, which was issued by Defendants in order  to obtain shareholder approval of the merger.  In the Proxy, Defendants presented two sets of figures representing its sales projections for 2013—one set of figures that Cooper had originally provided to Apollo and other potential purchasers during their merger negotiations and another set of "revised" expected results that reflected the sales figures after the close of the first quarter, which ended on March 30, 2013.  Specifically, Defendants caused the Company to represent that it had originally projected net sales of $4.445 billion and EBITDA, or "Earnings Before Interest,

Taxes, Depreciation and Amortization," of $525 million for 2013."[2]  However, "[f]ollowing the completion of the first quarter of 2013, Cooper Tire updated its financial projections to include EBITDA would generally be considered a more conservative figure than operating profit, which is often expressed as Earnings Before Interest & Tax ("EBIT"), as EBITDA removes two non-cash expense items (depreciation and amortization) from the equation.  Actual results from the first quarter of 2013 and revised expected results for the remainder of fiscal year 2013. The revised projections included (in millions)":

|  | 2013 |
|---|---|
| Net Sales | $ 4,218 |
| EBITDA | $ 538 |

72.    The Proxy also provided "sensitivity case" projections that took into account the "cyclicality of the global tire industry, and high margins that the industry had been experiencing."  According to the Proxy, the sensitivity case projections included assumptions to reflect the effects of a cyclical downturn, followed by a cyclical recovery, on revenue and EBITDA, including "reduced net sales based on expectations for average industry volume growth, consistent pricing and Cooper Tire's geographic presence;" "reduced expected future margins based on historical margins;" and "reduced expected future capital expenditure costs in response to revised business conditions."   According to the Proxy, even in the pessimistic "sensitivity case," Cooper projected revenues as follows (in millions):

|  | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| Net Sales | $  4,188 | $  4,349 | $  4,516 | $ 4,690 | $ 4,870 |
| EBITDA | $  521 | $  457 | $  384 | $  446 | $  511 |

---

[2] EBITDA would generally be considered a more conservative figure than operating profit, which is often expressed as Earnings Before Interest & Tax ("EBIT"), as EBITDA removes two non-cash expense items (depreciation and amortization) from the equation.

73.     Defendants knew that these projections were materially false and misleading when they issued the Proxy.   Indeed, three weeks earlier, on August 9, 2013, Defendants provided Apollo with projections showing $3.9 billion in revenues for 2013—or nearly $300 million less than the forecasted $4.188 billion net sales in Cooper's pessimistic "sensitivity case" projections.

74.     Defendants never updated the Proxy or these financial projections before the shareholder vote on September 30, 2013, or otherwise provided Cooper investors the true facts concerning its rapidly deteriorating financial condition.   By the time of the shareholder vote, Defendants were internally projecting $3.4 billion in revenues and $257 million in operating profit for 2013—or 20% and 50% lower than $4.188 billion in net sales and $521 million EBITDA for 2013 that it reported to shareholders as the pessimistic "sensitivity case" figures in the proxy.

75.     As Cooper's financial performance was floundering, Defendants resorted to desperate measures in an attempt to reassert control over CCT.   As defendant Hughes later testified, under Defendants' direction and on their watch, Cooper cut off payments to CCT's raw material suppliers in an effort to force CCT to cave and agree to the merger.   According to Hughes, "We thought that might encourage them to be more cooperative."   According to Apollo, another tactic proposed by Cooper (through the Defendants) to reassert its control over its own subsidiary was such "a drastic course of action" that it "was likely to result in a physical clash between the two security firms and place the personal safety of the CCT workers at risk."

76.     Indeed, in attempting to complete the merger and appease Chengshan, Apollo executives met directly with executives from Chengshan to seek to buy out its stake in CCT. According to trial testimony, Apollo's offer of $150-$200 million for Chengshan's stake was

rejected out-of-hand by Chairman Che, who instead demanded $400 million for his stake—or nearly one-sixth of Apollo's $2.5 billion purchase price for all of Cooper.

77.     As Defendants were taking these increasingly desperate measures, they were affirmatively misrepresenting the true impact of the CCT strike in soliciting shareholder proxies to approve the troubled transaction.  While the Proxy noted that, due to the CCT strike, the CCT facility was not producing any Cooper-branded tires and that CCT employees had taken "disruptive actions, including denying access to certain representatives of the Company and withholding certain business and financial information," Defendants caused the Company to reiterate its confidence that the facility would return "to full, normal operation again as soon as possible."  According to Defendants, "[n]either the strike nor the plant slowdown are expected to have an effect on the consummation of the merger."  Moreover, the Proxy included the Merger Agreement which set forth Defendants' representations that, among other things, Cooper had "exclusive possession" of its CCT subsidiary, had effective internal controls over its financial reporting and that it had policies and procedures in place to ensure the Company's subsidiaries' compliance with the law.

78.     The situation at CCT, and the fact that Cooper had been entirely cut-off from its primary subsidiary, was described internally by Cooper's auditors at Ernst & Young as virtually unprecedented, and called into question the Company's financial results.  In fact, as revealed in the Delaware litigation, in an email to his co-workers, one Ernst & Young accountant questioned whether the Company could reliably provide any accurate information to investors:

> I'm looking for some examples or thoughts on a situation at Cooper Tire where a material Chinese sub is currently striking (including office workers) and have refused to produce, ship or perform any accounting functions (among other activities).  Cooper's CCT sub is protesting the announced acquisition of Cooper Tire by Apollo Tyres, an Indian listed company. The sub typically represents 25% of revenue and earnings on a consolidated basis and has been striking since around the 1st of July. They were able to close June and July as the finance department was permitted to work in the building, however for the August close,

they will be estimating results of the sub (not yet sure on what basis) and are not sure what they will do for September if the issue is not resolved.

I'm obviously concerned about the situation and given the size of the entity, whether they will even be able to ensure materially accurate results. I'm just trying to get some thoughts together on considerations they and we should be making regarding their ability to report and our ability to review/audit, perform S404 testing and complete the required accounting for the Apollo acquisition. Also keeping in mind that Cooper is also in the midst of a $2 billion debt offering so we will have to report August results in the context of the comfort letter.

79.     Accounting experts who testified at Cooper's trial expressed the same concern. For example, Robert Cepielik, a forensic accountant at Deloitte Financial Advisory Services LLP, testified that having a unit withhold financial information from a parent trying to put out consolidated financial results is a "highly unusual situation.  I've never seen anything like it."

80.     But while such a situation is unprecedented, it was not unexpected by Defendants. Indeed, Apollo was told by Defendants of at least one instance in the past few years in which Chengshan denied Cooper management access to the facility to review manufacturing processes, demonstrating that Cooper never had exclusive possession or the actual ability to control its primary subsidiary.

81.     In addition, as revealed in trial testimony, contrary to the statements in its August Proxy solicitation, the situation at CCT was "a big problem" for Cooper.  Defendant Armes testified that the disruption "caused a lot of things that is causing us problems with being able to get in, being able to get the financial information, and it was brought on by this acquisition." Moreover, in an e-mail dated August 27, 2013, Apollo managing director Neeraj Kanwar wrote to defendant Armes, stating "I am writing in reference to the deteriorating situation with your joint venture in China.  We and, increasingly, our financing banks are growing more and more anxious regarding the issues [here], the lack of demonstrable progress and the impact this is all having on your financial results and our ability to complete this transaction."

**D.     The Defendants Gamble on Forcing the Merger to Close**

82.     Even though Defendants knew that Chengshan opposed the deal and had before denied Cooper access to the CCT plant, Cooper executives proceeded with the transaction because they were highly motivated to gamble that they could close the transaction at the $35 per share price.  For example, defendant Armes was expected to reap about $21 million if the sale went through.  Specifically, defendant Armes would reap $7 million from the appreciated value of the stock he owns outright, and restricted and performance-based shares and change-in-control provisions in his compensation agreement entitled him to another $14 million if, after the merger, he leaves the Company or his compensation or terms of employment are significantly altered, as is common in transactions of this kind.  When counting his personal shares, defendant Armes was eligible to receive more than $21 million if the deal went through.

83.     Enticed by these extraordinary incentives, Defendants were more than willing to disregard the risks posed by Chengshan and mislead investors to ensure shareholder approval of the deal—while they had no personal downside risk if the deal eventually fell apart, they needed shareholders' approval in order to cash in on their gamble.  As Dick Stephens, a former president of Cooper's North American Tire Operations, who retired in 2006 after 28 years with the Company, explained, "[e]ssentially, this is corporate greed."   According to Stephens, "You've got key executives who have no tie, no concern about anything other than themselves…and 'If I can walk out of there with $10 million, $20 million, $30 million or more, and screw everybody else, or potentially screw everybody else, I don't care.'"

**D.     Defendants' False and Misleading Statements**

**1.     Announcement of the Transaction and Merger Agreement**

84.     On June 12, 2013, Defendants caused the Company to announce that it had agreed

to be acquired by Apollo for approximately $2.5 billion, or a price of $35 per share, representing a 40% premium over Cooper's 30-day volume-weighted average price.

85.     In announcing the transaction before the opening of the market, Defendants caused the Company to highlight its Chinese operations as critical to the deal.  For example, Defendants caused Cooper to describe the merger as bringing "together two companies with highly complementary brands, geographic presence, and technological expertise to create a global leader in tire manufacturing and distribution" with "strong presence in high-growth end-markets," including China.  That press release highlighted Cooper's "Chengshan" brand, and noted that "Cooper is one of the most respected names in the tire industry, with an extensive distribution network and manufacturing infrastructure, and a particularly robust presence in North America and China."  According to the press release, due to Cooper's significant presence in China, the "combined company will be uniquely positioned to address large, established markets, such as the United States and the European Union, as well as fast-growing markets of India [and] China…where there is significant potential for further growth."

86.     Defendants also caused the Company to file numerous documents with the SEC on June 12, 2013 that provided additional details about the merger to investors, and which highlighted Cooper's China operations.  For example, Defendants claimed that the combined company would have "a strong presence in the largest tire market of North America as well as the fastest-growing geographies such as China and India, among others."

87.     In addition, on June 12, 2013, Defendants caused the Company to file the Merger Agreement in which they represented that:

   • "[T]he Company or one of its Subsidiaries has exclusive possession of each Owned Real Property and Leased Real Property," including the CCT facilities;

   • that Cooper "maintained effective internal controls over its financial reporting, that it had maintained accurate and reasonably detailed records concerning the

transactions and disposition of its assets, recorded transactions as necessary in order to permit preparation of financial statements in accordance with GAAP, and provided reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on its financial statements;"

• That Cooper and its "Subsidiaries were in compliance with applicable Laws, and have policies and procedures providing reasonable assurance of continued compliance with such Laws;" and that

• "Since December 31, 2012…its Subsidiaries and, to the Knowledge of the Company, its Joint Ventures have conducted their respective businesses only in the ordinary course of business consistent with past practice in all material respects."

88.     The above statements were materially false and misleading because, contrary to Defendants' assurances concerning the importance of and its control over its Chinese operations and CCT subsidiary, in particular, Defendants had no effective control over this business. Moreover, the above statements were materially false and misleading in that Defendants failed to disclose the true risks posed by the $2.5 billion transaction given that Cooper's joint venture partner opposed the transaction, had demanded compensation, and had the ability to thwart the deal by asserting its control over the CCT facility.

### 2.     Quarterly Report on the Form 10-Q for the Second Quarter of 2013

89.     On August 9, 2013, Defendants caused the Company to file its quarterly report on Form 10-Q for the second quarter ended June 30, 2013 (the "2Q13 Form 10-Q), which was signed by defendants Hughes and Huber.

90.     In addition, pursuant to the Sarbanes-Oxley Act of 2002, the 2Q13 Form 10-Q contained signed certifications ("SOX Certifications") by defendants Armes and Hughes, stating that the financial information contained in the 2Q13 Form 10-Q was accurate, and that any material changes to the Company's internal control over financial reporting were disclosed.  The SOX Certifications set forth:

I, [Roy V. Armes/Bradley E. Hughes], certify that:

1. I have reviewed this Quarterly Report on Form 10-Q of Cooper Tire & Rubber Company;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a- 15(f) and 15d- 15(f)) for the registrant and have:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b) Any fraud, whether or not material, that involves management or other

employees who have a significant role in the registrant's internal control over financial reporting.

\* \* \*

In connection with the Quarterly Report of Cooper Tire & Rubber Company (the "Company") on Form 10-Q for the period ended June 30, 2013, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), each of the undersigned officers of the Company certifies, pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, that, to such officer's knowledge:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company as of the dates and for the periods expressed in the Report.

91.     The 2Q13 Form 10-Q represented that the Company "maintain[ed] disclosure controls and procedures designed to ensure that information required to be disclosed" in SEC filings.  Further, the 2Q13 Form 10-Q represented that, other than changes associated with its implementation of an Enterprise Resource Planning ("ERP") software program, "[t]here have been no other changes in the Company's internal controls over financial reporting during the quarter ended June 30, 2013 that have materially affected, or are reasonably likely to materially affect, the Company's internal controls over financial reporting."   In addition, the 2Q13 Form 10-Q represented that, based on a review of the effectiveness of Cooper's internal controls, "the Company's CEO and CFO concluded that its disclosure controls and procedures were effective."

92.     The above statements were materially false and misleading because Defendants had caused the Company to lack effective internal controls over its financial reporting.  Indeed, under Defendants' direction and on their watch, Cooper had been denied access to its primary subsidiary responsible for a quarter of its profits and revenues as early as June 21, and had been fully barred from accessing the facility since at least mid-July, and could therefore not reliably provide any financial results on a consolidated basis.

### 3.      Proxy Solicitation Seeking Approval of the Merger

93.      On August 30, 2013, Defendants caused the Company to file the Proxy which sought shareholder approval of the merger.  While the Proxy noted that, due to the CCT strike, the CCT facility was not producing any Cooper-branded tires and that CCT employees had taken "disruptive actions, including denying access to certain representatives of the Company and withholding certain business and financial information," Defendants reiterated their confidence that the facility would return "to full, normal operation again as soon as possible."  According to Defendants, "[n]either the strike nor the plant slowdown are expected to have an effect on the consummation of the merger."

94.      In fact, as Defendants knew, the opposite was true: under Defendants' direction and on their watch, the transaction had been placed in dire jeopardy by the CCT strike.  Indeed, on August 27, 2013, three days before the Proxy was issued, Apollo bankers expressed to Apollo that they were "very concerned" about the transaction given the issues at CCT, prompting Apollo managing director Neeraj Kunwar to email defendant Armes to ask that Cooper "delay the mailing of its proxy by a few weeks."  Further, Kunwar explained through his counsel that the parties should focus on resolving the CCT strike first given the impact that the lack of access to financial records had on Apollo's ability to market the debt it needed to raise in order to complete the merger.  As Apollo told Cooper, the "completion of the Cooper-Apollo transaction may be in jeopardy."

95.      Moreover, Defendants' misleading disclosure in the Proxy downplaying the severity of the CCT strike also omitted the material facts that the CCT "disruption" was in fact controlled by Cooper's joint venture partner and that the strike had been specifically organized because under Defendants' direction and on their watch, Cooper had rejected its joint venture

partner's attempt to acquire Cooper for itself.  Nor did Defendants disclose that Chairman Che

had demanded nearly $400 million—or nearly one-sixth of the entire $2.5 billion deal amount—

in exchange for putting an end to the strike.

96.    Indeed, as was only disclosed at the end of the Relevant Period, Defendants

woefully misrepresented the severity of the CCT strike on the completion of the merger, and in

fact only disclosed the limited information it provided to investors about the CCT facility work

stoppage in the

97.    Proxy because of Apollo's insistence that Cooper disclose it.  As Vishal Mittal,

Apollo's CFO, explained in an October 4, 2013 letter to Stephen Zumasky, Cooper's general

counsel:

> In closing, we again remind you of your disclosure obligations under the Merger
> Agreement and U.S. securities laws. The disclosures regarding CCT that were
> included in the Proxy Statement, limited though they may be, were included there
> only on our insistence. The circumstances at CCT, combined with the frankly
> staggering deterioration in the Company's financial performance for the third
> quarter disclosed to us today, are circumstances that we have difficulty
> concluding are not required to be disclosed promptly under U.S. securities laws
> and stock exchange listing rules. We urge you to seek appropriate advice in these
> matters on which you, your board and we, as the ultimate successor following the
> Merger, can rely.

98.    Further, in the Proxy, Defendants provided materially false and misleading

financial projections that directly contradicted the financial projections that they had previously

provided to Apollo.  Specifically, Defendants caused Cooper to represent that it had originally

projected net sales of $4.445 billion and EBITDA of $525 million for 2013, and that

"[f]ollowing the completion of the first quarter of 2013, Cooper Tire updated its financial

projections to include actual results from the first quarter of 2013 and revised expected results

for the remainder of fiscal year 2013."  The revised projections included (in millions):

|  | 2013 |
| --- | --- |
| Net Sales | $  4,218 |
| EBITDA | $   538 |

99.    Defendants also provided more pessimistic "sensitivity case" projections that they claimed considered "reduced net sales based on expectations for average industry volume growth, consistent pricing and Cooper Tire's geographic presence;" "reduced expected future margins based on historical margins;" and "reduced expected future capital expenditure costs in response to revised business conditions." According to Defendants, even in the pessimistic "sensitivity case," Cooper projected revenues were as follows (in millions):

|  | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| Net Sales | $ 4,188 | $ 4,349 | $ 4,516 | $ 4,690 | $ 4,870 |
| EBITDA | $ 521 | $ 457 | $ 384 | $ 446 | $ 511 |

100.    As set forth above, the financial projections Defendants caused the Company to report were materially false and misleading and, in fact, directly contradicted the financial projections that Defendants had caused Cooper to provide to Apollo weeks before. The true projections showed that revenues for 2013 were $300 million less than the $4.188 billion net sales Defendants projected in Cooper's  publicly reported pessimistic "sensitivity case," and that the Company's projected operating profits were $200 million less than the $521 million in EBITDA the Defendants caused the Company to disclose to investors in the Proxy.

101.    Moreover, the Proxy included in the Merger Agreement set forth Defendants' representations that, among other things, Cooper had "exclusive possession" of its CCT subsidiary, had effective internal controls over its financial reporting and that it had policies and procedures in place to ensure the Company's subsidiaries' compliance with the law.  As set forth above, those statements were materially false and misleading because under Defendants' direction and on their watch, the Company had no effective control over its most important subsidiary or access to the CCT facility and, in fact, never did.

102.    Indeed, Defendants continued to  publicly deny the true impact of CCT's

shutdown throughout the Relevant Period. For example, at the November trial, defendant Hughes testified that, even though Cooper had no effective access to any information at CCT and was barred from retrieving necessary financial statements, Cooper was "still working on delivering financial results for the third quarter" and suggested that the Company would still be able to file its Form 10-Q for the third quarter, which was due to be filed in a week.

103.   In sum, the true facts, which Defendants knew but misrepresented or concealed from investors, were that: (i) the Merger was an incredibly high-risk transaction that had no reasonable prospects of being consummated at the $35-per-share price announced on June 12, 2013; (ii) Cooper did not have exclusive possession over its primary subsidiary, CCT, and in fact never had such possession or control; (iii) Cooper's lack of control over CCT, which accounted for nearly a quarter of its business, rendered Cooper's financial results unreliable; (iv) Cooper's operating results had grown increasingly dire in the weeks leading up to and through the August 30, 2013 Proxy filing and the September 30, 2013 shareholder vote, and the projections Defendants disclosed to investors provided a materially false and misleading picture of Cooper's financial performance and the true risk of the transaction; (v) under Defendants' direction and on their watch, Cooper lacked effective internal controls over its financial reporting; and (vi) rather than serve as a value-enhancing transaction, the Merger posed serious, long-term risks and harm to Cooper's business.

### E.   The Truth Begins To Emerge

104.   Recognizing that the Company lacked any control over its most important subsidiary, which was a fundamental roadblock to completing the transaction at the $35 per share price touted to investors, Defendants caused Cooper to preemptively file a lawsuit on October 4, 2013 in an attempt to force Apollo to close on the merger. On October 7, 2013,

before the markets opened, Defendants caused Cooper to filed a Form 8-K with the SEC which included a press release revealing that the deal was unraveling, as well as a copy of the complaint Cooper filed in the Delaware Chancery Court against Apollo on October 4, alerting investors that the deal was in dire jeopardy.  In response to these disclosures, and the realization that the merger would not be consummated at the $35 per share price or on the terms that shareholders had approved just days before, Cooper's common shares plunged.  Specifically, Cooper stock fell from $31.27 per share on October 3, 2013 to close at $25.72 per share on October 7, 2013.

105.    On October 14, 2013, Apollo filed its Answer to Cooper's Complaint in the Delaware Chancery Court.  Apollo counterclaimed, stating that under the Merger Agreement "Cooper promised to do a number of things that it had not done."  Apollo further noted that Cooper was not in compliance with the Merger Agreement,

> "in part because its representations and warranties are not true and because it has failed to perform its covenants . . . . [] Cooper does not have control over its most significant subsidiary, [CCT]. Indeed, following the announcement of the Merger Agreement, it has become clear and Cooper has admitted that Cooper has lost any physical control over, or even access to, CCT's operations, facilities, assets, and accounting books and records, assuming it ever possessed the access or control that it warranted it had in the Merger Agreement.

106.    Additionally, Apollo noted that Cooper, as a result of its arbitration with USW, had been enjoined from consummating transactions contemplated by the Merger Agreement until a labor agreement was reached with USW.

107.    As was made clear during the trial, Defendants had in fact exploited the inability of the parties to reach a deal with USW as pretext for its lawsuit, and this was the last-ditch effort to force Apollo to close.  For example, as revealed in trial testimony, contrary to Defendants' claim that Apollo had failed to use "reasonable best efforts" in reaching a resolution with the USW by allegedly excluding Cooper from the negotiation process, the truth was that the Company had a tumultuous relationship with the USW and that Apollo's direct negotiations with

USW were the only way to reach an agreement.  Louis P. DiLorenzo, Apollo's expert concerning

the use of "reasonable best efforts" in the USW negotiations, testified that he was "shocked" by

Defendants' arguments, given the extraordinarily antagonistic relationship between USW and

Cooper.

108.     According to DiLorenzo, excluding Cooper made perfect sense because "[i]f you

don't want to reach an agreement, you're definitely bringing people they don't like."  Indeed, it

is simply not plausible that the failure to reach an agreement with the USW had prevented the

transaction from closing given that the concessions sought by the USW were a mere fraction of

the $400 million in compensation that Chairman Che had demanded.

109.     On November 8, 2013, Vice Chancellor Glasscock of the Delaware Chancery

Court held that Apollo did not breach the merger agreement, and denied Cooper's request for an

order requiring Apollo to close on the merger.  In the ruling, the Court further elucidated that,

based on the information disclosed for the first time at trial, it was highly unlikely Cooper could

ever have been able to satisfy its obligations under the Merger Agreement because Cooper was

unable to produce its third-quarter financial results:

> [T]he reason for the extreme expedition of this action…is that Cooper seeks an
> order compelling specific performance by the morning of the business day next
> following closing arguments: November 12, 2013. Specific performance by such
> a date, according to Cooper, would relieve it of the obligation to disclose third-
> quarter financials to Apollo and its lenders, as would otherwise be required by
> financing agreements in support of the merger no later than November 14, 2013.
> Cooper is unlikely to be able to provide those financials due to the physical
> seizure of a Cooper subsidiary in China by a minority partner in that venture.

110.     In response to these disclosures, Cooper stock plummeted, falling from $26.90 per

share on November 7, 2013 to $23.82 per share on November 8, 2013.  The stock has not

recovered to any appreciable extent.

111.     On November 12, 2013, Defendants caused the Company to file a Notification of

Late Filing with the SEC, disclosing that it would be unable to timely file its Form 10-Q for the

quarter ended September 30, 2013 because it had no access to any business and financial information relating to CCT.   Further, Defendants caused the Company to disclose that it expected a "significant change" in its results of operations and that its operating profit will be "significantly lower" than Cooper reported for the same period a year before, in part as a result of the effects from the strike at CCT.   According to Defendants, given that the Company does not have sufficient information regarding its most important and profitable subsidiary, "a reasonable estimate of the results cannot be made."

112.   Following these disclosures, additional developments in the Delaware Chancery Court litigation confirmed that Cooper's claims against Apollo were without merit, and that the merger and the shut-down of the CCT subsidiary had in fact put Cooper's long-term business prospects in jeopardy.   Specifically, on December 16, the Delaware Supreme Court denied Cooper's appeal of the Delaware Chancery Court's November 8, 2013 ruling, holding that the appeal had been "improvidently accepted."

113.   On December 30, 2013, Defendants caused the Company to announce that it was formally terminating the merger.   On a webcast with investors that day, defendant Armes acknowledged that "the financing for the transaction [was] no longer available" and that it was "a reality that the agreement both companies signed on June 12 will not be consummated by Apollo."   On that same webcast, defendant Hughes admitted that Cooper still did not have any control over its CCT subsidiary or access to the information needed to generate the Company's financial results, and could not provide any estimate of "when the situation will be resolved or when we will resume normal [financial] reporting."

114.   In a press release published later that day, Apollo stated that "Cooper has been unwilling to work constructively to complete a transaction that would have created value for both

companies and their shareholders.   <u>Cooper's actions leave Apollo no choice but to pursue legal</u> <u>remedies for Cooper's detrimental conduct."</u>

115.    Accordingly, as a result of Defendants' breaches, the Company has been damaged.

## DERIVATIVE AND DEMAND ALLEGATIONS

116.    Plaintiff brings this action derivatively in the right and for the benefit of Cooper to redress the breaches of fiduciary duty and other violations of law by Defendants.

117.    Plaintiff will adequately and fairly represent the interests of Cooper and its shareholders in enforcing and prosecuting its rights.

118.    The Board currently consists of the following nine (9) directors: defendants Armes, Capo, Chapman, Holland, Meier, Niekamp, Shuey, Wambold, and Welding.   Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful and useless act, for the following reasons:

> a. Defendants Armes, Capo, Chapman, Holland, Meier, Niekamp, Shuey, Wambold, and Welding (*i.e.* the entire Board) caused and/or allowed the Company to fail to perform its covenants under the Merger Agreement, including (but not limited to) the inability of Cooper to produce third quarter financial results.  This resulted in a de facto termination of the sale to Apollo. This egregious activity is not entitled to the protection of the business judgment rule.   Defendants Armes, Capo, Chapman, Holland, Meier, Niekamp, Shuey, Wambold all served on the Board throughout the course of the Relevant Period, including at the time when Defendants announced that Cooper would be acquired by Apollo, and during all negotiations related to the proposed acquisition.  As a result, defendants Armes, Capo, Chapman, Holland, Meier, Niekamp, Shuey, Wambold and Welding are not entitled to the protection of the business judgment rule, rendering any demand upon them futile.
>
> b. Defendants Armes, Capo, Chapman, Holland, Meier, Niekamp, Shuey, Wambold, and Welding (i.e. the entire Board) caused and/or allowed the Company to fail to perform its covenants under the Merger Agreement, including (but not limited to) the inability of Cooper to produce third quarter financial results.  This resulted in a de facto termination of the sale to Apollo.

Defendants Armes, Capo, Chapman, Holland, Meier, Niekamp, Shuey, Wambold all served on the Board throughout the course of the Relevant Period, including at the time when Defendants announced that Cooper would be acquired by Apollo, and during all negotiations related to the proposed acquisition.  As a result, defendants Armes, Capo, Chapman, Holland, Meier, Niekamp, Shuey, Wambold and Welding each face a substantial likelihood of liability, rendering any demand upon them futile.

c.  The principal professional occupation of defendant Armes is his employment with Cooper as its CEO and President, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits.  In addition, according to the Company's Proxy Statement filed with the SEC on Form DEF 14A on March 26, 2013 (the "March 2013 Proxy"), Defendants have admitted that defendant Armes is not independent.  Thus, defendant Armes lacks independence from demonstrably interested directors, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action.

d.  During the Relevant Period, defendants Capo, Chapman, Niekamp, and Shuey served as members of the Audit Committee.  Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee were and are responsible for, *inter alia*, reviewing the Company's annual and quarterly financial reports and reviewing the integrity of the Company's internal controls.  Defendants Capo, Chapman, Niekamp, and Shuey breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted the Company to disseminate false and misleading statements in the Company's SEC filings and other disclosures and caused the above-discussed internal control failures.  Therefore, defendants Capo, Chapman, Niekamp, and Shuey each face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

e.  Defendants Armes, Capo, Chapman, Holland, Meier, Niekamp, Shuey, Wambold, and Welding (i.e. the entire Board) caused and/or allowed the dissemination of the false and misleading Proxy.  As set forth above, the Proxy was false and misleading because (among other things) it contained false financial projections and misstatements regarding the Company's control over its subsidiaries and its business operations.  As a result, defendants Armes, Capo, Chapman, Holland, Meier, Niekamp, Shuey, Wambold and Welding each face a substantial likelihood of liability, rendering any demand upon them futile.

## COUNT I
## AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY FOR DISSEMINATING FALSE AND MISLEADING INFORMATION

119.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

120.    As alleged in detail herein, each of the Defendants (and particularly the Audit Committee Defendants) had a duty to ensure that Cooper disseminated accurate, truthful and complete information to its shareholders.

121.    Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to Cooper shareholders materially misleading and inaccurate information through, *inter alia*, SEC filings and other public statements and disclosures as detailed herein.   These actions could not have been a good faith exercise of prudent business judgment.

122.    As a direct and proximate result of Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

## COUNT II
## AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR FAILING TO MAINTAIN INTERNAL CONTROLS

123.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

124.    As alleged herein, each of the Defendants had a fiduciary duty to, among other things, exercise good faith to ensure that the Company's financial statements were prepared in accordance with GAAP, and, when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

125.    Defendants willfully ignored the obvious and pervasive problems with Cooper's

internal controls practices and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

126.    As a direct and proximate result of the Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages.

**COUNT III**
**AGAINST ALL DEFENDANTS FOR UNJUST ENRICHMENT**

127.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

128.    By their wrongful acts and omissions, the Defendants were unjustly enriched at the expense of and to the detriment of Cooper.

129.    Plaintiff, as a shareholder and representative of Cooper, seeks restitution from these Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

**COUNT IV**
**AGAINST ALL DEFENDANTS FOR ABUSE OF CONTROL**

130.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

131.    Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Cooper, for which they are legally responsible.  In particular, Defendants abused their positions of authority by causing or allowing Cooper to misrepresent material facts regarding its financial position and business prospects.

132.    As a direct and proximate result of Defendants' abuse of control, Cooper has sustained significant damages.

133.    As a result of the misconduct alleged herein, Defendants are liable to the

Company.

134.     Plaintiff, on behalf of Cooper, has no adequate remedy at law.

## COUNT V
## AGAINST ALL DEFENDANTS FOR GROSS MISMANAGEMENT

135.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

136.     Defendants had a duty to Cooper and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of Cooper.

137.     Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of Cooper in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, Defendants breached their duties of due care, diligence and candor in the management and administration of Cooper' affairs and in the use and preservation of Cooper's assets.

138.     During the course of the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants caused Cooper to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to Cooper, thus breaching their duties to the Company.  As a result, Defendants grossly mismanaged Cooper.

## COUNT VI
## AGAINST DEFENDANTS FOR VIOLATIONS OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

139.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

140.    Rule 14a-9, promulgated pursuant to §14(a) of the Securities Exchange Act of 1934, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. §240.14a-9.

141.    Defendants caused the Proxy to be materially false and misleading.  Defendants caused the Proxy to contain misstatements and/or omissions of material facts.  Further, Defendants' disclosures following the issuance of the Proxy did not, as required, update and correct Defendants' previous misstatements, and themselves contained material misstatements and/or omissions.

142.    Defendants' proxy solicitations included all statements which served to color the market's view of the deal and encourage Cooper shareholders to vote in favor of the merger. As set forth above, Defendants' proxy solicitations were misleading concerning the true risks of the merger and its impact on Cooper's business.  Among other things, Defendants caused the Proxy to contain false financial projections and misstatements regarding the Company's control over its subsidiaries and its business operations. Further, Defendants were under a continuing duty to update and/or correct these material omissions by disclosing the relevant facts, as well as update and/or correct any false or misleading statements they had made concerning the transaction.

143.    In the exercise of reasonable care, Defendants should have known that the statements contained in the Proxy were materially false and misleading.

144.    The Company was damaged as a result of the Defendants' material misrepresentations and omissions in the Proxy.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.      Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B.      Directing Cooper to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board

C.      Awarding to Cooper restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: April 17, 2014

**RIGRODSKY & LONG, P.A.**

By:  */s/ Brian D. Long*
       Seth D. Rigrodsky (#3147)
       Brian D. Long (#4347)
       Gina M. Serra (#5387)
       2 Righter Parkway, Suite 120
       Wilmington, DE 19803
       302-295-5310

       *Attorneys for Plaintiff*

**THE WEISER LAW FIRM, P.C.**
Robert B. Weiser
Brett D. Stecker
Jeffrey J. Ciarlanto
22 Cassatt Avenue, First Floor
Berwyn, PA 19312
Telephone:  (610) 225-2677
Facsimile:  (610) 408-8062

**RYAN & MANISKAS, LLP**
Katharine Ryan
995 Old Eagle School Road, Suite 311
Wayne, PA 19087
Telephone: (484) 588-5516
Facsimile:  (484) 450-2582

## **VERIFICATION**

I, Jim Fitzgerald, under penalty of perjury, state as follows:

I am the Plaintiff in the above-captioned action. I have read the foregoing Complaint and authorized its filing. Based upon the investigation of my counsel, the allegations in the Complaint are true to the best of my knowledge, information and belief.


DATED: 3-18-74

Jim Fitzgerald